# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2024

Lyle W. Cayce
Clerk

No. 22-30734

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

TRAVIS R. JAMES,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:18-CR-21-1

Before JONES, HAYNES, and DOUGLAS, *Circuit Judges*.

PER CURIAM:[*]

Travis R. James appeals the denial of his motion to withdraw his guilty plea, arguing that it was not made knowingly and voluntarily because he received ineffective assistance of counsel. The district court, applying the factors set forth in *United States v. Carr*, 740 F.2d 339 (5th Cir. 1984), concluded that the balance of factors weighed against withdrawal. Finding that the district court did not abuse its discretion, we AFFIRM.

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-30734

# I. Background

Following an investigation of drug-trafficking activity in and around Baton Rouge, Louisiana, the United States charged James in 23 counts of a 28-count indictment returned March 1, 2018, alleging that he and 15 other defendants committed various drug-trafficking and firearm offenses. Over the next two years, the indictment was superseded four times.[1]

James hired two attorneys, J. David Bourland and Ronald Haley, Jr., to represent him. Bourland appeared on behalf of James at the initial appearance on the original indictment and continued to serve as his lead counsel for over three years. Bourland had previously represented James and other members of the drug-trafficking enterprise in state criminal matters. Haley enrolled as additional counsel in May 2018.

## A. Plea Agreement

After receiving discovery, Bourland concluded that James could not succeed at trial and would be facing 30 years to life if convicted. With James's permission, Bourland initiated plea negotiations with the prosecutors. His negotiations were largely successful. In exchange for James agreeing to plead guilty to the conspiracy count, the felon-in-possession count, and the charge of money-laundering conspiracy in the bill of information,[2] Bourland convinced the United States to delete the prior-conviction enhancement to the § 846 conspiracy charge so that the mandatory minimum would be 10, rather than 20 years. The United States also agreed to dismiss the § 924(c)

---

[1] Relevant to this appeal, at the arraignment for each superseding indictment, the district court informed him of the charges pending against him and the maximum possible penalties associated with those charges.

[2] *See* 21 U.S.C. § 846 (Count 1 of the Fourth Superseding Indictment); 18 U.S.C. § 922(g) (Count 4), 1956(h); and 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(B)(i), 1956(h) and 2 (Conspiracy to Launder Money from Bill of Information).

2

firearm count, which otherwise would have required a five-year consecutive sentence. With an estimated criminal history category of II or III, the United States estimated that James's guidelines range for the drug offenses would be 235 to 293 months or 262 to 327 months.

Bourland also discussed the possibility of "informal cooperation" by James, who was unwilling to enter a formal cooperation agreement. The United States stated that it could advise the court of any "quiet proffer and assistance" provided by James without a cooperation agreement, indicating that it could acknowledge at sentencing that James "should get credit for each defendant that comes in after he pleads." Bourland thought that, even without a substantial assistance motion, "maybe the court would be kind enough to take that into consideration at sentencing."

In a letter, Bourland informed James of the terms of the proposed plea agreement.[3] The letter explained that neither the felon-in-possession charge nor the money-laundering charge would affect the guidelines calculation. A few weeks later, Haley met with James at the jail to discuss the plea agreement. James read the written plea agreement, and he and Haley signed it. The agreement advised James that the "maximum possible penalty [for the conspiracy count] is a term of life imprisonment, a fine of up to $10,000,000 and a lifetime of supervised release." It advised that "[t]here is a mandatory minimum penalty on [the conspiracy count] of 10 years imprisonment and at least 5 years of supervised release." It also advised on the role of the Sentencing Guidelines:

> The Court will determine in its sole discretion what the defendant's sentence will be. While the Court must consider

---

[3] The plea agreement contained a waiver of appeal, but because claims of ineffectiveness of counsel are excepted from the waiver, the waiver does not apply here. *United States v. Strother*, 977 F.3d 438, 442-43 (5th Cir. 2020).

> the United States Sentencing Guidelines in imposing sentence, the Sentencing Guidelines are not binding on the Court. The Court could impose any sentence from the minimum possible penalty up to the maximum possible penalty as set out above despite any lesser or greater sentencing range provided for by the Sentencing Guidelines.

As part of the agreement, James acknowledged that no promises regarding sentencing had been made and that he understood that representations by his counsel about his anticipated sentence were only estimates and were not binding on the court.

In advising James to accept the plea, his counsel represented to him that by pleading guilty he was avoiding a trial that would likely result in a conviction of 30 years to life. James's counsel suggested that by pleading guilty he would receive a guidelines range between 15 and 20 years, and he would receive credit for codefendants who pleaded guilty after him. At no time did either counsel advise James that he could receive a life sentence by pleading guilty, however, he was repeatedly advised by the district court.

## B. Plea Colloquy

In October 2020, James pleaded guilty pursuant to the plea agreement. At the re-arraignment proceeding, the district court advised James about the sentencing process and the maximum and minimum penalties he faced, including a maximum of life imprisonment for the drug conspiracy charge, and James indicated his understanding. The district court specifically advised him that representations by his counsel regarding a possible sentence were estimates, not guarantees:

> The Court:    I'm going to explain sentencing to you, Mr. James. Mr. James, you've had two very able attorneys. You need to understand that the sentence—if they have predicted a sentence to

No. 22-30734

|  |  |
|---|---|
| | you, it's just exactly that: it's a prediction. Do you understand? |
| James: | Yes, ma'am. |
| The Court: | All right. The Court does not know what the sentence will be or will likely be until after the Court receives the presentence investigation report. That report has not been prepared yet. Your lawyers don't have that report. If the Court doesn't know what the sentence is going to be, your lawyers don't know what your sentence is going to be. Do you understand that? |
| James: | Yes, ma'am. |

The district court also explained the role of the Sentencing Guidelines and that "the Court can go up or down from the guidelines, depending on a number of factors." After its colloquy with James, the district court accepted his guilty plea.

## C. Presentence Report

The Presentence Report ("PSR") included a total offense level of 43 and a total criminal history score of 15, establishing a criminal history category of VI. Based on these calculations, the guidelines range was life imprisonment. Bourland objected to the drug quantity, enhancement for use of threats, and the enhancement for sophisticated money laundering. The probation office issued a revised report that removed enhancements for use of threats and engaging in criminal conduct as a livelihood but retained the enhancement for sophisticated money laundering. However, there was no change in James's total offense level or criminal history score in the revised PSR.

## D. Motions to Withdraw Plea

James moved pro se to withdraw his guilty plea because his PSR did not reflect any "reduction or recommendation" despite the informal

agreement that he would receive credit for his codefendants pleading guilty. He accused the United States of breaching the terms of the plea agreement and sought to "force the government to honor the terms of its agreement or allow the defendant to withdraw his guilty plea." Significantly, at this time, James made no claim that the guidelines calculation in the PSR differed from the advice given by his attorneys. The motion was received by the clerk's office on March 3, 2021, but it was not filed by the clerk because James was represented by counsel.

Several weeks later, Bourland filed the pro se motion into the record, noting that he did not concur with the motion and filed it only as a courtesy to James. Then, Bourland withdrew as James's counsel. The district court denied James's motion to withdraw his plea without prejudice, accepting the United States' argument in opposition that it had not breached any agreement because the PSR "was to be shared with the Court at sentencing," which had yet to occur.

In December 2021, Haley was suspended from practicing law in an unrelated case. Shortly thereafter, James was assigned new counsel. Through new counsel, James filed a second motion to withdraw his guilty plea on August 19, 2022. In his new motion, he argued that Bourland and Haley were laboring under nonwaivable conflicts of interest and that he was misinformed of his sentencing exposure under the plea agreement.

The district court held an evidentiary hearing on the motion, at which Bourland and Haley testified. Haley testified that he and Bourland "guesstimated" what James's sentence would be based on the terms of the plea agreement. He testified that he never informed James that he could be facing a life sentence and admitted that he did not think James would have signed the plea agreement if he knew that he could have been sentenced to life imprisonment.

Bourland testified that with all his clients, he does his "very best to give a good [sentencing] estimate" but cautions that he will not make the ultimate decision. In this case, he explained that the Sentencing Guidelines were not mandatory and that the defense could request a variance with good reason. Bourland estimated a sentence "somewhere between 15 and 20 years." Bourland testified that he would not have advised that James take the plea agreement if he knew a life sentence was possible.

At the conclusion of the hearing, the district court denied the motion to withdraw from the bench, and later provided supplemental reasons in writing. The district court stated that "the real issue[] in this case [is] whether or not [James's] plea was knowing and voluntary, and that turns on whether or not he received ineffective assistance of counsel." Noting Bourland's role as lead counsel, the court found that he "had a very close and reliable and trusting working relationship with Mr. James" and that he "gave [James] what his best estimate was based on what he believed that he could negotiate and what he believed that he could advocate to the Court." And finding that James was advised at his re-arraignment that any sentencing estimate by his attorneys was merely a prediction, the court concluded that Bourland's sentencing estimate did not vitiate the knowing and voluntary nature of the plea.

## E. Sentencing

At sentencing, the court granted Bourland's objection to the adjustment for sophisticated money laundering, lowering James's total offense level to 41 and his guidelines range to 360 months to life. The United States represented, as it had agreed to, that several codefendants pleaded guilty on James's coattails. In response, the court acknowledged that James "set the example for some others who came forward and accepted responsibility." However, the court did not lower the sentence on that basis, noting the seriousness of the offense, James's leadership role, and James's

criminal history. James was sentenced to 360 months on Count 1 of the indictment, to be followed by a five-year term of supervised release, and a 120-month term of imprisonment on Count 4 of the indictment and Count 1 of the bill of information, to be followed by a three-year term of supervised release, all to run concurrently. James timely appealed. FED. R. APP. P. 4(b)(2).

## II. STANDARD OF REVIEW

We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion. *United States v. Strother*, 977 F.3d 438, 443 (5th Cir. 2020). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *Id.* (quoting *United States v. Lord*, 915 F.3d 1009, 1013-14 (5th Cir. 2019)).

## III. ANALYSIS

### A. STANDARD FOR WITHDRAWAL OF GUILTY PLEA

A defendant may withdraw his guilty plea after the district court accepts the plea but prior to sentencing "for any reason the granting of the privilege seems fair and just." *United States v. Carr*, 740 F.2d 339, 343 (5th Cir. 1984) (quoting *United States v. Rasmussen*, 642 F.2d 165, 167 (5th Cir. 1981)); FED. R. CRIM. P. 11(d)(2)(B). The following factors should be considered when deciding whether a defendant shows a fair and just reason for withdrawal:

> . . . (1) whether or not the defendant has asserted his innocence; (2) whether or not the government would suffer prejudice if the withdrawal motion were granted; (3) whether or not the defendant has delayed in filing his withdrawal motion; (4) whether or not the withdrawal would substantially inconvenience the court; (5) whether or not close assistance of counsel was available; (6) whether or not the original plea was knowing and voluntary; and (7) whether or not the withdrawal

would waste judicial resources; and, as applicable . . . [(8)] the reasons why a defendant delayed in making his withdrawal motion.

*Carr*, 740 F.2d 339, 343-44 (internal citations omitted). The defendant bears the burden of proving the withdrawal is justified. *Id.* at 344. "No single factor or combination of factors is dispositive." *Strother*, 977 F.3d at 443. Instead, we consider the totality of the circumstances. *Carr*, 740 F.2d at 344.

"[T]he trial court's decision regarding a withdrawal motion must be accorded 'broad discretion.'" *Id.* (quoting *United States v. Morrow*, 537 F.2d 120, 146 (5th Cir. 1976)); *see also Rasmussen*, 642 F.2d at 167 ("[I]t is well settled that there is no absolute right to withdraw a guilty plea before the imposition of sentence. Instead, the right to do so is within the sound discretion of the trial court. . ..")).

### B. Applying the Standard to James's Motion
#### i. Assertion of Innocence

The first *Carr* factor asks whether the defendant has asserted his innocence. *Carr*, 740 F.3d at 343-44. "Under the *Carr* framework, the defendant must not only assert his innocence, but also provide a 'substantial supporting record' for this assertion in order to support his motion to withdraw." *Strother*, 977 F.3d at 444. The district court concluded that this factor weighed against withdrawal, explaining that James "admitted his guilt under oath" and now "neither asserts his innocence nor presents any evidence to contradict the factual basis for the plea."

James concedes that "while [this factor] does not weigh in James's favor, [it] should not weigh very much against him," because "every defendant who has ever moved to withdraw a guilty plea necessarily had admitted his guilt under oath at his rearraignment." But, as the United States notes, we have held that the lack of a timely and supported assertion of

innocence weighs against withdrawal.[4]  *See Strother*, 977 F.3d at 444, *United States v. Lampazianie*, 251 F.3d 519, 524-25 (5th Cir. 2001); *United States v. Badger*, 925 F.2d 101, 104 (5th Cir. 1991).  Accordingly, the district court did not err in concluding that this factor weighed against withdrawal.

### *ii. Prejudice to the Government*

The next *Carr* factor asks whether the government would suffer prejudice if the withdrawal motion were granted.  *Carr*, 740 F.2d at 344.  The district court concluded that this factor weighed against withdrawal, accepting the United States' argument that "because five years have passed since the criminal conduct at issue—the Government will have to regather witnesses and victims spread across the country."

James argues that "any difficulties the Government may have had in taking James to trial were essentially same the day before James pleaded guilty as they were the day after James sought to withdraw his plea" because at the time James pleaded guilty, "other defendants had yet to enter guilty pleas." The United States counters by noting that James's first motion to withdraw his plea did not raise the same issues presently before us and was denied without prejudice.  But "[t]he motion to withdraw that is the subject of this appeal was filed 21 months after the guilty plea and was heard two years after the guilty plea."  By the time that motion was heard and ruled on, eight years had gone by since the beginning of the charged conspiracy.

We have held that the prosecution is prejudiced when "almost three years have elapsed since the superseding indictment was filed, and for some witnesses the relevant conduct occurred . . . over seven years ago."

---

[4] In so saying, we are mindful of the "importance of protecting the innocent and insuring that guilty pleas are a product of free and intelligent choice." *North Carolina v. Alford*, 400 U.S. 25, 38 n.10 (1970). Innocent people do plead guilty for various reasons, but that is not the case for James.

*Lampazianie*, 251 F.3d at 525.  Again, the district court correctly concluded this factor weighed against withdrawal.

### iii. Delay in Filing Motion to Withdraw and Reasons for Delay

We next consider whether the defendant has delayed in filing his withdrawal motion and the reasons why the defendant delayed in making his motion.  *Carr*, 740 F.2d at 344.  We have held that the longer a defendant delays in filing a withdrawal motion, "the more substantial reasons he must proffer in support of his motion." *Lord*, 915 F.3d at 1015 (quoting *Carr*, 740 F.2d at 344).  The district court found that James was not prompt in filing his motion to withdraw, focusing on the timeline from the release of the PSR to the filing of his first motion to withdraw, a delay of four months.  The district court concluded that James's desire to withdraw his guilty plea was not due to a "prompt change of heart" but was "in direct reaction to the PSR."

James argues that he "sought to withdraw his guilty plea once he discovered that he had been misled by his attorneys regarding the sentence he would receive, a discovery that he could not have made until he was presented with his PSR."  The United States counters that "James did not allege that he was misled by his attorneys until the second motion to withdraw, which was filed 21 months after the plea, 18 months after disclosure of the initial PSR, and 17 months after his *pro se* motion to withdraw."

We agree with the United States and find the district court erred in measuring the length of time between the release of the initial PSR and the filing of his pro se motion to withdraw. James's first motion to withdraw was premised on his argument that the United States was not upholding its end of the bargain in granting credit for his unofficial assistance.  It was denied without prejudice, as sentencing had not yet occurred to assure the United States upheld its end of the bargain, which it ultimately did.  It was not until

James's second motion to withdraw that he raised the claims before us today—that his plea was not knowing and voluntary because his counsel was ineffective. Accordingly, James's motion to withdraw was the product of substantial delay as it was filed over a year later on August 19, 2022.

Even if we measured the delay from the receipt of the PSR (February 9, 2021) to James's attempt to submit his pro se motion to withdraw (March 3, 2021), as James concedes, our precedent supports the district court's conclusion that this factor weighs against withdrawal because it was submitted 22 days later. In *Carr*, "[t]he defendant waited twenty-two days before filing his motion for withdrawal of his guilty plea. . .." *Carr*, 740 F.2d at 345. This delay weighed against withdrawal. *Id.*; *see also Badger*, 925 F.2d at 104 (delay of three weeks weighed against withdrawal). Though there was more time until sentencing in the instant case than in *Carr*, we have stated that "[t]he purpose is not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *Id.* That is precisely what happened here. Accordingly, this factor also weighs against withdrawal.

### iv. Substantial Inconvenience to Court & Waste of Judicial Resources

We next consider whether withdrawal would "substantially inconvenience the Court" and "waste judicial resources." *Carr*, 740 F.2d at 344. "The district court's assessment of this factor is entitled to substantial deference since it is in the best position to know the effect that the withdrawal had on its resources." *Carr*, 740 F.2d at 345. The district court first stated that in the present case, "significant resources have already been extended on the re-arraignment proceeding and in preparation for James's upcoming sentencing." But it noted that "these logistical factors . . . are present in nearly every case," and would not defeat a compelling presentation justifying withdrawal. Absent such a showing, however, it found these factors favor denial.

James argues that these factors "by their nature, can never weigh in favor of granting the motion," and do not favor denial. The United States counters that "re-scheduling a complex trial would be a difficult task which would disrupt the court's heavy docket." It further notes additional areas where judicial resources would be wasted: "[t]he probation office conducted a presentence investigation culminating in a 66-page PSR" and "the investigating officer wrote a 15-page addendum and a 66-page revised PSR" addressing objections. Mindful of the substantial deference owed to the district court on these factors, we find the district court correctly determined that they weigh against withdrawal.

### v. Close Assistance of Counsel

Next, we consider whether the defendant received close assistance of counsel. *Carr*, 740 F.2d at 344. "Counsel's assistance may be close without being effective." *United States v. Urias-Marrufo*, 744 F.3d 361, 366 (5th Cir. 2014). The district court noted that James had two attorneys active in his defense, that Bourland filed numerous motions on his behalf, that Bourland successfully negotiated a plea agreement and received concessions from the United States, that Haley visited James multiple times in jail, and that James expressly acknowledged that he was "well satisfied with both Mr. Bourland and Mr. Haley" at his re-arraignment.

James concedes that he received close assistance of counsel, but argues that this factor should not favor denying the motion to withdraw because the "close assistance underlies the reason James seeks to withdraw his guilty plea" due to his attorneys "misadvise[]." Nonetheless, as the United States notes, we have held that close assistance of counsel weighs against withdrawal. *Strother*, 977 F.3d at 444-45.

We have previously found close assistance of counsel where counsel negotiated a plea agreement, filed motions, discussed the case with the

defendant, and explained the defendant's rights and the weight of the evidence. *Strother*, 977 F.3d 438, 445. Likewise, where counsel was available throughout the proceedings and the defendant expressed satisfaction with counsel's performance. *Strother*, 977 F.3d at 445; *Lord*, 915 F.3d 1009, 1015-16. This is precisely the situation here. Accordingly, this factor too weighs against withdrawal.

### *vi. Knowing and Voluntary*

Finally, we reach the crux of James's argument. A guilty plea involves the waiver of constitutional rights, so it must be "voluntary, knowing, and intelligent." *Strother*, 977 F.3d at 445 (quoting *Lord*, 915 F.3d at 1016). "This requires that the defendant understand the nature of the charges against him, the consequences of his plea, and the nature of the constitutional protections that he is waiving." *Id.* When a defendant enters a guilty plea upon the advice of counsel, the voluntariness of the plea depends, in part, on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (internal quotation marks and citation omitted).

To prevail on an ineffective assistance of counsel claim, a defendant must satisfy the requirements of *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant must show (1) that his "counsel's performance fell below an objective standard of reasonableness" and (2) that his counsel's deficient performance caused him prejudice. *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004). James's *Strickland* claim fails "if he cannot establish either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either." *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008).

The district court concluded that counsel was not deficient, and that "even assuming that counsel's Guidelines estimation was unreasonable,"

"the Court cannot say that [James] would have proceeded to trial." The district court noted that "there remains plenty to gain by pleading guilty," even with a guidelines range of life. "The Court has the ability to grant a variant sentence," "[d]efense counsel ha[d] filed five unresolved objections to the guideline calculations," and defense counsel had "discussed arguments for a downward departure from the Guidelines with counsel for the Government." Further, although the district court considered under the reasonableness prong, it noted that despite counsel's underestimation of the guidelines sentence, "James was plainly advised by the Court that, statutorily, he could receive a life sentence."

James argues that he trusted his attorneys, and reasonably relied on their affirmations that he would receive a lesser sentence. He also points to Bourland's testimony that if he knew James was facing a life sentence, he would not have advised him to take the plea. The United States argues that James had no realistic chance of success at trial and that his primary interest was reducing his sentence, something a guilty plea is most likely to result in. It notes that the plea agreement reduced his minimum guidelines sentence by five years. It also claims that James presented no evidence that he would have rejected the plea agreement if he knew what the guidelines range would be, and that the contemporaneous evidence in the record weighs against a finding of prejudice as James was repeatedly informed of the maximum possible sentencing exposure he faced.

Here, even if James showed deficient performance, he is unable to show prejudice. Accordingly, we conclude the district court did not err in finding this factor also weighed against withdrawal. "To prove prejudice, the defendant must show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Strickland*, 466 U.S. at 694. In the context of a guilty plea, that means there is a reasonable probability that the defendant "would not have

pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *Young v. Spinner*, 873 F.3d 282, 285 (5th Cir. 2017).

This inquiry "focuses on a defendant's decision[-]making." *Lee v. United States*, 582 U.S. 357, 367 (2017). "When a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than go to trial, we do not ask whether, had he gone to trial, the result of that trial 'would have been different' than the result of the plea bargain." *Id.* at 364. "Of course, in many cases a defendant's prospects at trial are relevant to whether he or she would have gone to trial instead of pleading guilty." *Valdez*, 973. F.3d at 403. For example, "[w]here a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one." *Lee*, 582 U.S. at 367. Factors relevant to determining whether a defendant would have gone to trial can also include "the risks [he] would have faced at trial," "his 'representations about his desire to retract his plea,'" and "the district court's admonishments." *United States v. Batamula*, 823 F.3d 237, 240 n.4 (5th Cir. 2016) (quoting *United States v. Kayode*, 777 F.3d 719, 725 (5th Cir. 2014)).

Here, as acknowledged by Bourland and undisputed by James, there was no plausible chance of an acquittal at trial. "The record supports this strategic decision of weighing great risk of conviction and an unavoidable statutory maximum sentence versus entering the guilty plea and then seeking reduction to a sentence with mitigating factors that could come with the guilty plea." *Valdez*, 973 F.3d at 405; *see Lee*, 582 U.S. at 367 ("And a defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial.").

Here, the United States offered an attractive plea deal because it agreed to drop the 924(c) count and take five years off James's expected

sentence. Where contemporaneous evidence suggests that James's primary concern was minimizing his sentence, the district court's determination that he had much to gain by pleading guilty is apt. "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee*, 582 U.S. at 369.

As noted by the United States, the guilty plea provided multiple avenues for minimizing James's sentence. Pleading guilty demonstrated acceptance of responsibility, offered the possibility of a downward variance for informal cooperation, and resulted in dismissal of the 924(c) count. Of note, the district court sentenced James to 360 months, when he was otherwise facing life. James's pro se motion to withdraw also suggests his primary concern of minimizing his sentence through the plea agreement, because he faulted the United States for not providing a reduction for his informal assistance, not his attorneys for misadvising him.

Finally, James was repeatedly informed of the statutory penalties, despite the purported errors of counsel. In the plea agreement itself, James was informed of the statutory penalties and that the Sentencing Guidelines were discretionary. James acknowledged he had not been made any promises regarding sentencing and understood that any representations were only estimates that did not bind the court. Further, the district court's repeatedly admonished James about the possibility of a life sentence, including at the guilty plea colloquy, where he was informed of applicable statutory penalties and that any sentencing estimate by the attorneys was merely a prediction. Therefore, James understood he might not get the sentence predicted by counsel, but he chose to go forward. The district court did not err in finding this too weighed against withdrawal.

## IV. CONCLUSION

As the district court properly found, the balance of the *Carr* factors weighs against withdrawal of the guilty plea.  We conclude that its decision was not an abuse of discretion and accordingly AFFIRM.