

# NUMBER 13-20-00320-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## EX PARTE CARLOS NOE GALLEGOS

### On appeal from the 275th District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Silva
Memorandum Opinion by Justice Hinojosa**

This is an appeal from the denial of an application for writ of habeas corpus. By five issues which we re-organize as four, petitioner Carlos Noe Gallegos argues that the habeas court abused its discretion in denying the application because: (1) it erroneously failed to consider and apply the *Padilla v. Kentucky*, 559 U.S. 356 (2010), standard for evaluating deficient representation; (2) it applied the wrong standard for evaluating prejudice in an ineffective assistance of counsel argument; (3) its fact findings and legal conclusions were unsupported by the record; and (4) it erroneously overruled Gallegos's

evidentiary objections. We affirm.

## I. BACKGROUND FACTS

Gallegos became a naturalized United States citizen in 2010. As part of his citizenship application, Gallegos avowed that he had not committed a crime or offense in the five years prior to the submission of his application.

### A. The Underlying Offenses

On November 1, 2016, six years after Gallegos became a citizen, he was indicted for two counts of aggravated sexual assault of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(B). The charges arose from a delayed outcry from complainant L.G.[1], Gallegos's stepdaughter. L.G. alleged that on or about March 1, 2007, Gallegos (then a lawful permanent resident) inappropriately touched her when she was approximately seven years old. She also alleged that he exposed himself to her in 2009. These acts occurred during the five-year period preceding Gallegos's naturalization.

According to investigation reports, Gallegos admitted that in 2007, while his wife was at work, he instructed L.G. to remove her pants and underwear and to sit on his lap while he was nude. While they sat at a table, Gallegos told L.G. to color while he placed his genitalia between her buttocks and vagina and moved her back and forth. He stated that he did not penetrate her. Gallegos also admitted that two years later, in 2009, he exposed himself to L.G. while she was watching cartoons. His wife was in their master bedroom, resting due to a high-risk pregnancy. Gallegos's wife and stepdaughter eventually reported these offenses to law enforcement officials. They sought assistance

---

[1] We use initial for the minor complainants involved to protect their identities. *See* TEX. R. APP. P. 9.8 cmt.

from the local Catholic Charities organization and Mujeres Unidas, a local women's shelter, to move away from Gallegos.

Gallegos was arrested and spent approximately two weeks in jail. After his release on bail, he met with attorney Richard Gonzales. Gallegos, a native Spanish speaker, took his sister with him to the legal appointment so she could translate for him. Gallegos informed his attorney that he was a naturalized citizen. According to Gallegos, Gonzales admitted to Gallegos that he "did [not] know much about immigration law, but . . . because [Gallegos] was a citizen, [his] status as a citizen should [not] be affected by the criminal proceedings."

Gallegos stated that, relying on Gonzales's assurance that his immigration status would not be affected, he accepted the State's plea offer of deferred adjudication with six years' community supervision and a $1,000.00 fine on one of the charged offenses. In exchange for the plea, the State dismissed one count of aggravated sexual assault of a child and recommended that Gallegos receive credit for time served. According to Gallegos, Gonzales counseled him that "this was a great deal because [Gallegos] would not have to serve any prison time."

The plea documents signed by Gallegos set forth the following admonition, with a footnote citing *Padilla*:

> If you are not a citizen of the United States of America, a plea of guilty or no contest may, and under current Federal immigration rules is almost certain to, result in your deportation, the exclusion from admission to this country, or the denial of naturalization under federal law, and I, the [d]efendant, have been so advised by my attorney.

3

In signing the plea documents, Gallegos acknowledged that he was "aware of the consequences of the plea, including immigration circumstances, if applicable." The plea documents, however, only addressed immigration consequences for non-citizens, not naturalized citizens like Gallegos.

## B.     Application for Writ of Habeas Corpus

Based on this guilty plea and the nature of the crime committed, the United States government sought to denaturalize Gallegos in 2018. *See* 8 U.S.C. § 1451(a) (providing for revocation of a naturalization order if it was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation"). Under federal law, if Gallegos's citizenship became revoked, he would revert to the status of a lawful permanent resident and, in light of his guilty plea, he would be eligible for deportation. *See id.* § 1227(a)(2)(A)(i)(I) (providing that any any non-citizen who is "convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under § 1255(j) of this title) after the date of admission" and "for which a sentence of one year or longer may be imposed" is deportable).[2]

Gallegos subsequently filed an application for a writ of habeas corpus. *See* TEX.

---

[2] Sexual assault of a child is a "crime of moral turpitude" under 8 U.S.C. § 1182(a)(2)(A)(i)(I) for the purposes of denaturalization proceedings. *Judulang v. Holder*, 565 U.S. 42, 50 (2011); *United States v. Rubalcava Gonzales*, 179 F. Supp. 3d 917, 924 (E.D. Mo. 2016) ("The Board of Immigration Appeals ('BIA') routinely holds that sexual assault or abuse of a minor is a crime involving moral turpitude."); *United States v. Ekpin*, 214 F. Supp. 2d 707, 712–15 (S.D. Tex. 2002) (holding that defendant's sexual abuse of a child was "unquestionably a crime of moral turpitude"). "[A]n applicant for naturalization lacks good moral character and is ineligible for naturalization if he is convicted of or admits the commission of one or more crimes involving moral turpitude during the statutory period, even if the person was never charged, arrested or convicted." *Rubalcava Gonzales*, 179 F. Supp. 3d at 922.

CODE CRIM. PROC. ANN. § 11.072. In his application, Gallegos argued that he received ineffective assistance of counsel in accordance with *Padilla* because his attorney failed to clearly advise him that his guilty plea would result in denaturalization and the loss of citizenship. Gallegos explained that Gonzales "knew or should have known that eligibility for naturalization requires a showing of good moral character, and that having committed such an offense just three years earlier probably would have made [Gallegos] ineligible for citizenship in 2010." The application further noted that "[d]eferred adjudication constitutes a conviction for immigration purposes, and necessarily left [Gallegos] vulnerable to having his naturalization revoked."

In an affidavit attached to the habeas application, Gallegos testified how Gonzales's representation prejudiced him:

> Had I not been mis-advised by [a]ttorney Gonzale[s] of the nearly automatic immigration consequences of my plea, I would not have accepted the plea and I would have gone to trial, instead. For several important reasons, I would not have voluntarily agreed to a plea which could result in my return to Mexico.
>
> First and foremost, I have lived in the United States since 2003 as a lawful permanent resident and as a naturalized citizen since 2010. My family all live here. I would have fought the 2016 charge had I known I would be separated from my family.
>
> I would never have willingly accepted a plea that could result in my removal to my home country. I am married with one child, both of whom depend on me for assistance. I would not have voluntarily separated myself from my wife and child. Nor would I have subjected my family to living in Mexico, in order for my family to remain together.
>
> Lastly, had I known the immigration consequences of my guilty plea, I would not have accepted it, because I would never willingly accept being sent to Mexico, which is on the verge of civil war between feuding cartels and where corrupt law enforcement are closely allied to the various cartels. There, I would face possible kidnap[p]ing, extortion, and execution by

members of the M[exican] cartels and by those law enforcement officials tied to the Mexican cartels.

## C.   The Hearing on the Application for Writ of Habeas Corpus

The habeas court held a hearing on the application for writ of habeas corpus on December 11, 2019. Gallegos testified through an interpreter. Gallegos explained to the court that he became a lawful permanent resident in 2003 and obtained naturalized citizenship in 2010. He stated that he informed Gonzales about his naturalization status at their first meeting but that Gonzales did not "think it [was] going to affect [Gallegos] because of this criminal offense." He further claimed that Gonzales "said that he did [not] know anything about immigration, but he did [not] recommend anyone that knew about it." Gallegos interpreted this to mean Gonzales "was almost securing that it was not going to affect [his] documents."

On cross-examination, the following colloquy occurred between the State and Gallegos:

| | |
|---|---|
| STATE: | Just to clarify, you're not saying that you didn't commit the charges that you pled guilty to today, correct? |
| HABEAS COUNSEL: | I'm going to object to that, Your Honor. I believe the issue here is whether or not his attorney properly advised him of the plea of guilty and the [e]ffect on his immigration status. |
| STATE: | Your Honor, this is all interrelated, all of it; including what the evidence was. Because they brought up the fact that the State apparently did not agree to a lower charge and that has to do with the evidence in the case, Your Honor. |
| HABEAS COUNSEL: | Again, we are here on this writ trying to see if we can set aside the conviction based on ineffective |

6

|           |                                                                                                                        |
|-----------|------------------------------------------------------------------------------------------------------------------------|
|           | assistance of counsel based on the misinformation that was given to this gentleman concerning the consequences.         |
| STATE:    | Exactly. I am just trying to clarify.                                                                                   |
| THE COURT: | I'm going to overrule the objection. You may proceed.                                                                  |
| STATE:    | Mr. Gallegos, you are not here today testifying that you did not commit the offense that you pled guilty to, correct?   |
| GALLEGOS: | Yes.                                                                                                                   |

Later in the cross-examination, Gallegos acknowledged that although he knew of the good moral character requirement when applying for naturalization, he believed that the question asked about criminal charges for which he had been *convicted*, not those which he *committed*:

|           |                                                                                                                                           |
|-----------|-----------------------------------------------------------------------------------------------------------------------------------------|
| STATE:    | Okay. At the time that you applied in 2010 you do realize you had committed a crime in 2007, correct?                                     |
| GALLEGOS: | Yes.                                                                                                                                     |
| STATE:    | You knew you committed a crime back in 2007, correct?                                                                                    |
| GALLEGOS: | Yes.                                                                                                                                     |
| STATE:    | You just had not been charged for it, correct?                                                                                           |
| GALLEGOS: | Yes.                                                                                                                                     |
| STATE:    | Did you know that or were you aware that lying in the application could later affect, if it was proven that you lied, could affect your naturalization? |
| GALLEGOS: | No.                                                                                                                                     |

7

| | |
|---|---|
| STATE: | So you thought that you could lie in your application without consequences? |
| GALLEGOS: | No, I was not lying. I was not lying. I just didn't understand that question. |
| STATE: | Okay. |
| GALLEGOS: | Because I at no time lied. I would not have lied at any time if I had understood the question. |

Gallegos explained that he did not have an attorney assist him when he completed the application for naturalization.

The State offered an affidavit from Gonzales into evidence during this hearing. In his affidavit, Gonzales testified to the following:

> I advised [Gallegos] of his rights, the consequences of pleading guilty and all plea documents pertaining to his case. Included in those documents were his right to a jury trial, his right to confront State's witnesses[,] and the applicable range of punishment. I read and explained to [Gallegos] the section in the plea paperwork regarding U[.]S[.] citizenship which states, as a non-U[.]S[.] citizen, a plea of guilty would result in deportation, exclusion from the country[,] or denial of naturalization under [f]ederal law.
>
> While representing [Gallegos], I spent considerable time discussing the case, the State's evidence, which included a statement of accused, and all possible defenses that could be raised. We reviewed discovery, including but not limited to, reports and affidavits. We discussed all the evidence that was presented against him. I informed [Gallegos] of both the likelihood of success and the risks of proceeding with trial. We discussed the strengths and weaknesses of the State's case. I advised [Gallegos] that putting this case in front of a jury was a very risky move based on the facts of the case. However, I told him that there was a possibility that he could be acquitted of all charges, but also a possibility he would be found guilty. I explained to him that if found guilty he ran the risk of being sent to prison. Additionally, we spent time discussing[] the District Attorney's plea offer, which ultimately was negotiated in [Gallegos's] favor.
>
> [Gallegos] made it very clear that he did not want to go to prison and that he wanted me to try anything and everything to get him probation. I

8

spoke with the Assistant DA in the case and we had lengthy conversations about the plea deal. The original recommendation was a TDC prison sentence. After much negotiation and with input from the victim's family, a deferred probation sentence was offered. I attempted to try and find a way to get the case dismissed because of the immigration situation, but based on the facts and the willingness of the victim to proceed, those attempts were unsuccessful.

After considerable discussion of the evidence and the plea offer, [Gallegos] stated to me he did not want a jury trial and wanted to proceed forward with the deferred probation plea agreement. During his plea of guilty, the Court admonished [Gallegos] of the range of punishment, that any recommendation of the State is not binding on the Court, that the existence of a plea bargain limits the right of an appeal, and all immigration admonishments. Those included that a plea of guilty by a non-U[.]S[.] citizen may result in deportation, exclusion from this country or denial of naturalization under [f]ederal law. The Court found [Gallegos] competent to stand trial and was not coerced, threatened[,] or persuaded in any way to plead guilty. [Gallegos] stated that he understood the admonishments of the Court and was aware of the consequences of his plea, and the Court received the plea freely and voluntarily. When asked by the Court if he had anything to say as to why the sentence should not be pronounced, [Gallegos] answered "no[,]" [and] the Court proceeded to pronounce sentence upon [Gallegos].

## D. Habeas Court's Ruling

On March 24, 2020, the habeas court issued the following conclusions of law:

CONCLUSIONS OF LAW

1.  "In a post conviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief." [*Ex parte Maldonado*], 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

2.  To establish ineffective assistance of counsel, a defendant is required to show: (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for his attorney's errors, the result of the proceeding would have been different. *See* [*Strickland v. Washington*], 466 U.S. 668, 687 (1984). There is a strong presumption that counsel has rendered adequate assistance and exercised reasonable professional judgment. *See [i]d.* at 690.

9

3. The reviewing court is to consider the totality of the representation rather than merely focus on isolated errors. *See* [*Ex parte Kunkle*], 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). The right to "reasonably effective assistance of counsel" does not guarantee errorless counsel or counsel whose competency is judged by perfect hindsight. [*Saylor v. State*], 660 S.W.2d 822, 824 (Tex. Crim. App. 1983).

4. If a habeas applicant can show based on the totality of the circumstances that plea counsel's error was one that affected his understanding of pleading guilty, and if he can show by substantial and uncontroverted evidence (1) that deportation was the determinative issue for him in plea discussions; (2) that he had strong connections to the United States and no other country; and (3) that the consequences of taking a chance at trial were not markedly harsher than pleading guilty, then it might not be irrational to reject a guilty plea. [*Lee v. United States*], 137 S. Ct. 1958, 1967 (2017).

5. The Court heard evidence that, prior to applying for U.S. citizenship in 2010, Applicant had committed the offense to which he had pled in this cause. The Court also heard evidence that Applicant omitted from said citizenship application that he committed the offense to which he had ple[a]d[ed] in this cause. The Court also heard evidence that naturalization requires a showing of good moral character.

6. [Gonzales's] credible affidavit testimony makes clear that: Applicant was informed of the strengths and weaknesses of the State's case; Applicant was advised of the success and the risks of proceeding to trial; Applicant was advised that having a jury trial was a very risky move given the facts of the case; Applicant was much more concerned of avoiding prison time, rather than going to trial; Applicant was given immigration warnings prior to his plea of guilt by [Gonzales] and the Court; and [Gonzales] attempted to find a way to have the case dismissed due to the immigration situation, but was ultimately unsuccessful.

7. The Court finds that Applicant has failed to show, by substantial and uncontroverted evidence, the factors enunciated in [*Lee*]. *See* [*Lee*], 137 S. Ct. [at] 1967 . . .

8. The Court finds that Applicant's claims regarding ineffective assistance of counsel unmeritorious.

9.    The Court finds that Applicant's claims regarding the lack of an interpreter at his proceedings to be unmeritorious.[3]

10.   Applicant has failed to allege and prove facts which, if true, entitle him to relief. [*Ex parte Maldonado*], 688 S.W.2d [at] 116 . . . .

The court denied the application for writ of habeas corpus. Gallegos appeals.

## II. STANDARD OF REVIEW

Texas Code of Criminal Procedure article 11.072 is "the exclusive means by which the district courts may exercise their original habeas jurisdiction under Article V, Section 8, of the Texas Constitution" for individuals serving a term of community supervision. *Ex parte Torres*, 483 S.W.3d 35, 42 (Tex. Crim. App. 2016) (quoting *Ex parte Villanueva*, 252 S.W.3d 391, 397 (Tex. Crim. App. 2008)). Under article 11.072 writ proceedings, the trial judge is the sole finder of fact. *See State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013). Reviewing these appeals, we must afford almost total deference to a trial court's findings of fact when they are supported by the record, especially when those findings are based upon credibility and demeanor. *See id.*; *see also Ex parte Garcia*, 353 S.W.3d 785, 788 (Tex. Crim. App. 2011).

In reviewing a trial court's decision on a habeas corpus application, we view the facts in the light most favorable to the trial court's ruling. *See Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006); *see also Ex parte Galvan-Herrera*, No. 13-11-00380-CR, 2012 WL 1484097, at *3 (Tex. App.—Corpus Christi–Edinburg Apr. 26, 2012, pet. ref'd) (mem. op., not designated for publication). We must uphold the ruling unless the trial court abuses its discretion. *Wheeler*, 203 S.W.3d at 324. Although we afford

---

[3] This claim was not appealed.

almost total deference to the trial court's determination of the historical facts, those facts must be supported by the record. *See Ex parte Garza*, 192 S.W.3d 658, 661 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). If the resolution of the ultimate question turns on an application of legal standards, we review the determination de novo. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007).

### III. APPLICABLE LAW

To prevail on a claim that he entered an involuntary guilty plea due to ineffective assistance of counsel, Gallegos must satisfy a two-pronged standard showing that: (1) counsel rendered deficient performance and (2) Gallegos suffered prejudice as a result. *See Strickland*, 466 U.S. at 687–88; *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985); *Torres*, 483 S.W.3d at 43.

The first prong of *Strickland* requires Gallegos to show that his counsel's performance was deficient in that it failed to meet an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 687–88; *Ex parte Bowman*, 533 S.W.3d 337, 349–50 (Tex. Crim. App. 2017). In evaluating counsel's performance, we assess reasonableness under the circumstances of the underlying case viewed at the time counsel rendered assistance. *Bowman*, 533 S.W.3d at 350. We presume counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* (quoting *Strickland*, 466 U.S. at 690). Counsel's deficient performance must be affirmatively demonstrated on the record and not require retrospective speculation. *Lopez v. State*, 343 S.W.3d 137,

12

142 (Tex. Crim. App. 2011). We judge the totality of counsel's representation rather than focusing narrowly on isolated acts or omissions. *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

The Sixth Amendment right to effective assistance of counsel requires counsel to correctly advise non-citizen clients about potential immigration law consequences, including deportation, exclusion from admission, and denial of naturalization. *Padilla*, 559 U.S. at 366–67. "[I]f immigration law regarding deportation is 'not succinct and straightforward,' defense attorneys must merely advise their clients that they could be deported, but when the law is 'truly clear' that the defendant would be deported if convicted, defense attorneys have a duty to 'give correct advice [that] is equally clear.'" *Ex parte Garcia*, 547 S.W.3d 228, 229 (Tex. Crim. App. 2018). It is not sufficient for counsel to advise the client that deportation might occur and recommend the client to seek advice from an immigration lawyer. *Torres*, 483 S.W.3d at 45. If deferred adjudication for the charged offense will clearly result in removal proceedings, counsel's advice regarding those immigration consequences must be equally clear. *See Padilla*, 559 U.S. at 369; *see also Ex parte Doke*, No. 05-20-00826-CR, 2021 WL 4071153, at *2 (Tex. App.—Dallas Sept. 7, 2021, no pet.) (mem. op., not designated for publication).

In a typical *Strickland* inquiry, a defendant can demonstrate prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000). However, *Lee v. United States* provides a more nuanced prejudice analysis in the context of immigration cases:

When a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than go to trial, we do not ask whether, had he gone to trial, the result of that trial "would have been different" than the result of the plea bargain. That is because, while we ordinarily "apply a strong presumption of reliability to judicial proceedings," "we cannot accord" any such presumption "to judicial proceedings that never took place."

We instead consider whether the defendant was prejudiced by the "denial of the entire judicial proceeding . . . to which he had a right." As we held in *Hill v. Lockhart,* when a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

137 S. Ct. at 1965 (citing *Hill*, 474 U.S. at 52 (internal citations omitted)). In making this determination, courts should "not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Id.* at 1967.

#### IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Because Gallegos's first two issues—that the habeas court erroneously (1) failed to consider the *Padilla* standard for evaluating deficient representation and (2) applied the wrong standard for evaluating prejudice in an ineffective assistance of counsel argument—are interrelated, we address them together.

**A.      Deficient Performance**

*Strickland's* first prong requires us to analyze whether Gallegos's counsel provided deficient performance. *See Strickland*, 466 U.S. at 687–88. Both parties acknowledge that this is a matter of first impression: while *Padilla* clearly requires attorneys to warn non-citizens of immigration consequences after pleading guilty to certain crimes, it is unclear if *Padilla's* protections extend to naturalized citizens, who may also have

14

immigration consequences if it is shown that the naturalization was "procured by concealment of a material fact or by willful misrepresentation." *See* 8 U.S.C. § 1451(a).

Gallegos urges us to apply *Padilla* to this case, as the immigration consequences for pleading guilty to this crime were clear: "when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear." *Padilla*, 559 U.S. at 369. To date however, and as Gallegos admits, no Texas case has applied *Padilla* to naturalized citizens. Gallegos instead urges us to consider authority from other jurisdictions. *See Rodriguez v. United States*, 730 Fed. App'x 39, 42 (2d Cir. 2018) (holding counsel's advice deficient when Rodriguez was told "she did not have to worry about the immigration consequences of a plea [that] ignored the possibility of denaturalization"); *United States v. Kayode*, 777 F.3d 719, 723 (5th Cir. 2014) (holding counsel's representation was deficient when the defendant, a naturalized citizen, was not made aware of immigration consequences until the plea hearing); *see also* Amber Qureshi, *The Denaturalization Consequences of Guilty Pleas*, 130 Yale L.J.F. 166, 178–84 (2020) ("The Court's reasoning and holding in *Padilla* logically applies to denaturalization even though the Court did not explicitly acknowledge it in its opinion.").

The State, on the other hand, encourages this court to strictly limit *Padilla's* reach to non-citizen legal representation. Citing an unpublished concurring opinion from the Texas Court of Criminal Appeals, it argues that "[b]y its terms, the Supreme Court's holding in *Padilla* is limited to the *deportation* consequences of a plea." *Ex parte Velasquez-Hernandez*, No WR-80,325-01, 2014 WL 5472468, at *5 (Tex. Crim. App. 2014) (Keller, J., concurring) (not designated for publication); *see United States v.*

*Farhane*, No. 05 CR. 673-4 (LAP), 2020 WL 1527768, at *2 (S.D.N.Y. Mar. 31, 2020) (order) (holding that *Padilla* applied to non-citizens in "imminent risk of deportation," not to naturalized citizens that made "misrepresentations about not having engaged in criminal conduct and . . . illegally procured naturalization").

In an ineffective assistance claim, though, Gallegos must establish both deficient attorney performance *and* prove that it prejudiced him. *See Strickland*, 466 U.S. at 687. Because we conclude that the prejudice analysis is dispositive of this case, we assume without deciding that Gonzales's representation was deficient. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and *necessary* to final disposition of the appeal.") (emphasis added).

## B.  Prejudice

Whether a defendant is prejudiced by inadequate legal representation requires a "case-by-case examination," *Williams v. Taylor*, 529 U.S. 362, 391 (2000), of the "totality of the evidence," *Strickland*, 466 U.S. at 695. The United States Supreme Court has instructed judges to look to "contemporaneous evidence to substantiate a defendant's expressed preferences" when a defendant alleges that he would not have pleaded guilty but for an attorney's deficient advice on immigration consequences. *Rodriguez*, 730 Fed. App'x at 43 (citing *Lee*, 137 S. Ct. at 1967).

As *Lee* instructs us, in a case with immigration consequences like this, we do not look at the strength of the State's case when determining prejudice. *Lee*, 137 S. Ct. at 1965. The defendant does not have to show that he "would have been better off going to

16

trial." *Id.* Here, in fact, it appeared that the State had a strong case for conviction: an admission from Gallegos himself, statements from Gallegos's wife and the complainant L.G., and L.G.'s apparent willingness to pursue the charges. Instead, because of the citizenship implications, we look to whether Gallegos can show prejudice by demonstrating "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lee*, 137 S. Ct. at 1965 (citing *Hill*, 474 U.S. at 59). Rather than ask how a hypothetical trial would have played out absent counsel's error, we must consider if there is an adequate showing that Gallegos would have opted to go to trial if he was properly admonished. *See id.*

In *Lee*, both the defendant and the defendant's attorney gave testimony that deportation was the "determinative issue" in Lee's decision to plead guilty to drug charges instead of pursuing trial. *Id.* at 1967. Lee even testified that his attorney became "pretty upset because every time something c[ame] up I always ask[ed] about immigration status and the lawyer always said 'why are you worrying about something you don't need to worry about.'" *Id.* at 1963 (cleaned up). Lee, who was born in South Korea, had lived in the United States for thirty years, had established two businesses, and was the only family member who could care for his elderly parents who lived in the United States. *Id.* at 1968. Lee communicated these concerns to his attorney. Thus, the Supreme Court held that Lee had "adequately demonstrated a reasonable probability that he would have rejected the plea had he known that it would lead to mandatory deportation." *Id.* at 1967.

Gallegos has not established the same this record. Neither his testimony by affidavit or at the hearing, nor that of Gonzales, establish that deportation was a

"determinative issue" for him in deciding whether to plead guilty. *See id.* at 1967. In response to this, Gallegos urges us to consider *Rodriguez* for the proposition that a defendant need not ask continually about immigration consequences if he or she is relying on counsel's assurances that their immigration status will not be affected. *See* 730 Fed. App'x at 43.

In *Rodriguez*, the defendant legally entered the United States from the Dominican Republic in 1994 and became a naturalized citizen in 2007. *See id.* at 40. In 2010, Rodriguez pleaded guilty to federal conspiracy offenses which occurred prior to her naturalization. *Id.* Like Lee, Rodriguez had lived in the United States for a long period of time and was concerned about financially supporting her family. *See id.* at 41. At the plea hearing, Rodriguez's counsel emphasized that Rodriguez was the "sole basis of financial support for her two infant children . . . as well as both of her parents" and that her "family would suffer from severe collateral consequences due to [her] imprisonment." *Id.* The *Rodriguez* court recognized that, although there were "no statements at Rodriguez's plea hearing clearly demonstrating a 'single-minded focus' on avoiding negative immigration consequences," "this [was] not surprising given counsel's alleged early and continued assurances that there were *no* immigration consequences to worry about in her case." *Id.* at 43. Because the record established that Rodriguez's "sole concern with respect to a sentence was to ensure that she would be able to continue working in the United States to financially support her family," the court found that Rodriguez would have placed "paramount importance" on avoiding denaturalization and found prejudice. *Id.* at 44.

With the record before us, however, we cannot make this same determination.

18

Gonzales's affidavit alluded that Gallegos's "determinative issue" in deciding to plead guilty was "that he did not want to go to prison and that he wanted [Gonzales] to try anything and everything to get him probation." Gonzales further averred that "Gallegos stated to me he did not want a jury trial and wanted to proceed forward with the deferred probation plea agreement." There was no testimony from Gonzales, Gallegos, or Gallegos's sister (who was at the legal consultation) regarding Gallegos's concern for his family should he be deported.

Although we acknowledge the statement from Gallegos's affidavit concerning the tenuous security situation in Mexico, the record does not show that Gallegos mentioned this concern prior to or during the plea. The habeas court may have considered this to be a "*post hoc* assertion[] from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee,* 137 U.S. at 1967. Moreover, unlike the *Lee* and *Rodriguez* cases, Gallegos did not establish a contemporaneous record of strong family connection or responsibility to substantiate his claim of prejudice, either. Although Gallegos's affidavit *after* his plea set forth that he was "married with one child, both of whom depend[ed] on [him] for assistance," the investigation reports noted that Gallegos's wife, stepdaughter L.G., and biological daughter were all seeking shelter and resources from a local church and/or women's shelter in order to move away from Gallegos. Reviewing the facts in the light most favorable to the habeas court's ruling, we cannot say the court erred when it concluded that Gallegos did not prove that he was prejudiced by his trial counsel's failure to advise him that pleading guilty may result in his naturalization being revoked. *See Wheeler*, 203 S.W.3d at 324.

19

Examining the record of this case and the "totality of circumstances," we conclude that Gallegos did not establish prejudice under the definition set forth by *Lee*. *See Lee*, 137 S. Ct. at 1965; *Strickland*, 466 U.S. at 695; *Williams*, 529 U.S. at 391. Gallegos has not shown "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lee*, 137 S. Ct. at 1965.

## C.    Conclusion

Assuming without deciding that Gonzales's representation was deficient under *Padilla*, we conclude that, under this record, Gallegos has not established prejudice. *See Padilla*, 559 U.S. at 369; *Lee*, 137 S. Ct. at 1965. There is not "substantial and uncontroverted evidence" from the contemporaneous record that Gallegos would not have accepted a plea had he known it would lead to denaturalization. *See Lee*, 137 S. Ct. at 1969. We overrule issues one and two.

## V. Findings of Fact And Conclusions of Law

By his third issue, Gallegos contends the habeas court's "generic" findings of fact and conclusions of law were unsupported by the record.

Gallegos first asserts that the habeas court erroneously concluded Gallegos failed to prove his ineffective assistance of counsel claim.[4] Gallegos argues that *Padilla* required Gonzales to "specifically and accurately advise Gallegos that he would be denaturalized if he pleaded guilty." Gallegos submits that the habeas court's conclusion of law number six—which set forth that Gallegos "was given immigration warnings prior

---

[4] The habeas court's conclusion of law number eight provided that, "[t]he Court finds that [Gallegos's] claims regarding ineffective assistance of counsel [are] unmeritorious."

to his plea of guilt by [Gonzales] and the Court"[5]; and "[Gonzales] attempted to find a way to have the case dismissed due to the immigration situation, but was ultimately unsuccessful"—are actually findings of fact that are unsupported by the record.

The Texas Court of Criminal Appeals has held that, in the context of habeas cases, it "will afford no deference to findings and conclusions that are not supported by the record and will ordinarily defer to those that are." *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). The high court further clarified that where a given finding or conclusion is immaterial to the issue or irrelevant to the disposition of the case, it may decline to enter an alternative finding or conclusion. *See id.* at 728; *see also Ex parte Yusafi*, No. 09-08-00301-CR, 2008 WL 6740798, at *1 (Tex. App.—Beaumont Aug. 26, 2009, pet. ref'd) (mem. op., not designated for publication) (holding, in an ineffective assistance of counsel case, that "[s]hould a given finding or conclusion be immaterial to the issue or irrelevant to [the court's] disposition, we may decline to consider said finding or conclusion and, instead, consider the findings and conclusions that are supported by the record and are germane to the resolution of the habeas appeal"). Assuming but not deciding that the habeas court's conclusion that Gonzales provided adequate legal representation is not supported by the record, it is "immaterial" to the *Strickland* analysis because we previously held that Gallegos did not establish prejudice. *See Strickland*, 466 U.S. at 687; *Reed*, 271 S.W.3d at 727.

Gallegos, however, challenges this conclusion of law too, and asserts that the

---

[5] The State concedes that "the [habeas] court's finding that [Gallegos] was provided immigration warnings prior to his plea of guilt *by the trial court*" is unsupported by the record.

habeas court "misstated and then misapplied" the *Lee* standard to prove prejudice. The court's conclusion of law number seven provided that, "[t]he Court finds that Applicant has failed to show, by substantial and uncontroverted evidence, the factors enunciated in *Lee*." We disagree with Gallegos and hold that this is a conclusion based in the record for the reasons previously enunciated in our prejudice analysis, *supra*.

Under our standard of review, if the resolution of the ultimate question turns on an application of legal standards, we review the determination de novo. *See Peterson*, 117 S.W.3d at 819. Having reviewed the prejudice finding under the de novo lens of analysis, we overrule this issue.

## VI. EVIDENTIARY ISSUE

By his fourth issue, Gallegos contends that the habeas court erroneously overruled his evidentiary objections when the State inquired into Gallegos's guilt at the habeas hearing.

An appellate court applies an abuse of discretion standard of review when reviewing a trial court's ruling on the admission of evidence. *See Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement." *Id.* (citing *Green v. State*, 934 S.W.2d 92, 101–02 (Tex. Crim. App. 1996)). If there is error, the appellate court must conduct a harm analysis. *See* TEX. R. APP. P. 44.2. Any error, defect, irregularity, or variance that does not affect substantial rights, however, must be disregarded. *Id.*

Here, the evidence Gallegos protests is his admission to committing the underlying crime during the habeas hearing. At the hearing, Gallegos's counsel's objection appeared

22

to be one of relevance: "I'm going to object to that, Your Honor. I believe the issue here is whether or not his attorney properly advised him of the plea of guilty and the [e]ffect on his immigration status." *See* TEX. R. EVID. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Gallegos contends that he was harmed when the State erroneously used this "wrongfully elicited testimony as an excuse for trial counsel's deficient performance."

However, as Gallegos admits, "[i]t is not clear whether the [habeas] court considered or gave any credit" to this information. Further, because Gallegos had already acknowledged that he committed these offenses in a statement to the San Juan Police Department, this information was cumulative. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding that "any error in admitting . . . evidence [is] harmless in light of other properly admitted evidence proving the same fact").

Because the complained-of evidence was cumulative, *see Brooks*, 990 S.W.2d at 287, any error in its admission would be harmless. *See* TEX. R. APP. P. 44.2. Accordingly, we overrule this issue. *See Casey*, 215 S.W.3d at 879.

## VII.   CONCLUSION

We affirm the habeas court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
29th day of November, 2022.

23